*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRY LEE CEASOR,

        Defendant-Appellant.

UNPUBLISHED
May 23, 2019

No. 338431
St. Clair Circuit Court
LC No. 05-000220-FH

Before: REDFORD, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM.

From an order directing this Court to grant defendant a "new direct appeal" entered by the federal district court in defendant's habeas proceeding, defendant, Terry Lee Ceasor, seeks review of his conviction of first-degree child abuse, MCL 750.136b(2), for which he was sentenced to serve 2 to 15 years' imprisonment. Presently before this Court is a claim that trial counsel provided ineffective assistance by failing to either obtain public funding to hire an expert that would have supported his theory of the case, or alternatively, by failing to find an expert willing to provide services pro bono. For the reasons stated below, we affirm.

## I. PROCEDURAL HISTORY

Following defendant's 2006 conviction, he appealed and among other issues asserted that his retained trial counsel, Kenneth Lord, provided ineffective assistance by failing to obtain the testimony of an expert who could have challenged the prosecutor's expert, Dr. Holly Gilmer-Hill, regarding whether the victim's injuries were the result of intentional abuse as opposed to an accidental fall from a short distance. Noting that defendant had not sought an evidentiary hearing[1] to establish a factual record to support his claim, this Court concluded from the available record that defendant's claim failed. *People v Ceasor*, unpublished per curiam opinion

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

of the Court of Appeals, issued July 12, 2007 (Docket No. 268150). Our Supreme Court denied defendant's application for leave to appeal. *People v Ceasor*, 480 Mich 926 (2007).

Defendant sought a writ of habeas corpus in the federal district court in 2008. That proceeding spanned nearly a decade. The court held the habeas petition in abeyance while defendant sought relief under Subchapter 6.500 of the Michigan Court Rules. After that failed,[2] defendant returned to the federal district court which initially denied relief but the Sixth Circuit Court of Appeals reversed in 2016. *Ceasor v Ocwieja*, 655 Fed Appx 263 (CA 6, 2016). In a lengthy decision, the court concluded that defendant's appellate counsel's performance was deficient because he (1) did not file a separate motion seeking a remand to the trial court in defendant's direct appeal, (2) did not provide an affidavit or offer of proof in support of such a motion as is required by MCR 7.211(C)(1)(a), and (3) stated in his appellate brief that the question of trial counsel's effectiveness could be decided on the existing record. *Id*. at 279-282. The Sixth Circuit remanded the matter to the federal district court with directions that it hold an evidentiary hearing and decide whether appellate counsel's failures caused defendant prejudice. *Id*. at 290. The Sixth Circuit directed the district court that if it found prejudice it must conditionally grant the writ of habeas corpus "to allow the state courts to consider a new appeal or a renewed request for a *Ginther* hearing . . . ." *Id*. at 289-290. If the district court found no prejudice, then it could deny further relief. *Id*. at 290.

On remand to the federal district court, the parties obviated the need for an evidentiary hearing by entering a stipulated order stating that "appellate counsel's deficient performance prejudiced Petitioner because appellate counsel failed to litigate in state court a claim of ineffective assistance of trial counsel that was reasonably likely to succeed." The court "made no finding on whether the underlying claim of ineffective assistance of trial counsel [would] ultimately succeed." The order directed this Court to, "within 60 days, grant the Petitioner a new direct appeal of right."

This Court duly opened the present claim of appeal on May 19, 2017. Defendant then filed a motion for a new trial in the trial court pursuant to MCR 7.208(B)(1). The trial court held an evidentiary hearing and denied the motion, concluding that Lord's representation was not objectively deficient. Defendant now argues that the trial court erred and that Lord provided ineffective assistance for failing to seek public funds to hire an expert witness under MCL 775.15, or alternatively, by failing to seek the assistance of an expert who would have provided services pro bono. We disagree with the defendant. We affirm defendant's conviction and sentence.

---

[2] See *People v Ceasor*, unpublished order of the Court of Appeals, entered October 4, 2011 (Docket No. 304703) (denying leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."), and *People v Ceasor*, 491 Mich 908 (2012) (denying leave to appeal for the same reason).

## II.  ANALYSIS

### A.  STANDARD OF REVIEW

A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law.  *People v Carll*, 322 Mich App 690, 702; 915 NW2d 387 (2018).  The trial court's factual findings are reviewed for clear error, while the ultimate constitutional issue is reviewed de novo.  *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010).

### B.  BACKGROUND

Defendant's convictions arose out of head injuries sustained by BG, an approximately 17-month-old child on October 3, 2004.  On this day, while BG was in the sole care of defendant, BG's mother's boyfriend at the time, BG suffered injuries to his head serious enough to cause him to lose consciousness and require immediate emergency medical attention.

At trial, the court qualified Dr. Gilmer-Hill, as the prosecution's expert in shaken baby syndrome (SBS).  She testified that BG's injuries resulted from intentional abuse and would not be consistent with an accidental fall from a short distance.  Defendant testified that the child apparently fell during his absence from the room.  Defendant presented no expert testimony to contradict Dr. Gilmer-Hill.  The jury deliberated for an extended period but eventually convicted defendant.

The record reflects that before defendant's trial, Lord consulted with Dr. Faris Bandak who had a background in engineering.  Dr. Bandak reviewed materials sent to him by Lord, and was prepared to testify that the victim's injuries could have occurred as defendant stated.  Lord consulted with defendant regarding the importance of Dr. Bandak's testimony.  Defendant assured Lord that he would obtain funds to pay Dr. Bandak's fees for trial testimony, but later just before trial informed Lord that he lacked the funds necessary to pay Dr. Bandak's fee, and as a result, defendant went to trial without an expert to support his theory.

Some understanding of the history of SBS, or the now-preferred term, abusive head trauma (AHT), helps to put this matter in context.  The debate over SBS/AHT diagnoses has a lengthy history, with experts still coming to differing conclusions regarding whether injuries, such as those sustained by the victim in this case, are unique to intentional abuse.  See *Sissoko v State*, 236 Md App 676, 717-725; 182 A3d 874 (2018).  As the Maryland Court of Appeals explained in *Sissoko*, "In the latter decades of the 20th century, it became widely accepted in the involved medical communities that shaking was the likely mechanism of brain injury when infants and young children presented with subdural hematomas, retinal hemorrhages, and brain swelling, but without external evidence of trauma or a reported history of a significant traumatic event."  *Id*. at 718-719.  But "[t]here were some in the biomechanical scientific community who disputed that shaking could produce forces sufficient to cause the injuries seen in shaken baby syndrome cases[.]"  *Id*. at 719.  These studies were not without their critics.  "When scientists altered the models . . . they found that shaking *does* exceed injury thresholds, to the extent those thresholds can be calculated with any precision."  *Id*. at 719 n 33.  But there were some who "began to consider whether impact on a soft surface, independent of or in combination with shaking, also could be a mechanism for some of the intracranial findings in abuse cases."  *Id*. at

720. "It remains the prevailing view within the relevant medical communities that there are some internal findings that are highly correlated with abusive head trauma, even in the absence of external findings; and when those internal findings are coupled with an inconsistent clinical history or one that is inadequate to explain them, and cannot be explained medically, a diagnosis of abusive head trauma is supported." *Id*. at 722.

> The main controversy over abusive head trauma involves a minority of physicians and other scientists who posit that changes in the understanding of the biomechanics of shaking, coupled with evidence that the confluence of subdural hematomas, retinal hemorrhages, and brain swelling is not unique to abusive head trauma, make it impossible to reliably conclude that any particular child's injuries or death were caused by inflicted (non-accidental) trauma, as opposed to accidental trauma or medical causes, such as clotting disorders. [*Id*. at 725.]

The United States Supreme Court has explained that in the late 1990s and early 2000s, doubt "increased in the medical community over whether infants can be fatally injured through shaking alone." *Cavazos v Smith*, 565 US 1, 13; 132 S Ct 2; 181 L Ed 2d 311 (2011) (quotation marks and citation omitted). The United States Supreme Court referenced Dr. Bandak's published 2005 study in which he wrote, " 'Head acceleration and velocity levels commonly reported for SBS generate forces that are far too great for the infant neck to withstand injury . . . . [A]n SBS diagnosis in an infant . . . without cervical spine or brain stem injury is questionable and other causes of the intracerebral injury must be considered.' " *Id*., quoting Bandak, *Shaken Baby Syndrome: A Biomechanical Analysis of Injury Mechanisms*, 151 Forensic Sci Int'l 71, 78 (2005). The Supreme Court noted that several other studies and articles written from 2003 to 2008 concluded that one could not assume that certain types of head injuries were solely indicative of child abuse. *Cavazos*, 565 US at 13-14 (collecting articles).

In this case, Lord contacted Dr. Bandak, whose opinions regarding SBS/AHT supported defendant's defense theory. Lord explained that at the time it was difficult to even locate such an expert and Dr. Bandak's position and research on the topic constituted "cutting-edge technology." Lord could find no other experts willing to challenge the prosecution's medical expert. Lord negotiated with Dr. Bandak regarding the rate for his services. Lord consulted with defendant, who repeatedly told Lord that he would find the money to secure Dr. Bandak's testimony at trial. Lord obtained multiple adjournments of trial all based on the representation that defendant needed the time to secure funds to pay Dr. Bandak. Lord testified at the evidentiary hearing that he suspended defendant's obligation to pay Lord's own fees so that defendant could save for the cost of hiring Dr. Bandak, and Lord paid Dr. Bandak's initial consultation fee out of the retainer defendant paid to Lord. Defendant continually represented to Lord that he would secure the money, either by saving his own money and perhaps selling a vehicle, or if all else failed, by borrowing the money from his mother.

Two weeks before the trial date, however, defendant informed Lord that he could not obtain the money himself and that he would not ask his mother for any more financial assistance. A frustrated Lord tried to convince defendant to ask his mother for help, but defendant refused. Instead, defendant told Lord that an expert was not necessary because defendant would be a good witness and the jury would believe him. At that point, Lord prepared for trial with what he had.

Lord discussed with defendant how to present himself to the jury and Lord came up with a strategy aimed at gaining the jury's sympathy, explaining to the jury that defendant, a hard-working individual, lacked the financial resources to afford an expert to combat the expert put forward by the prosecution. Lord also used the knowledge that he had gained from his discussions with Dr. Bandak to cross-examine the prosecution's expert. Lord's strategy clearly had an effect. The jury deliberated for days and reported at one point that it could not reach a unanimous verdict. Ultimately, however, the jury convicted defendant.

Defendant argues that Lord provided him ineffective assistance primarily on the ground that Lord should have sought financial assistance from the court under MCL 775.15. Defendant posits that Lord should have done so at the outset of the case or later when defendant finally informed Lord that he lacked the financial ability to pay Dr. Bandak's fees. Alternatively, defendant argues that Lord should have looked for and obtained the services of another expert who would have provided expert services for free.

On appeal, defendant bears the burden of establishing that defense counsel provided ineffective assistance by showing that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (quotation marks and citation omitted). Defendant must overcome a strong presumption that defense counsel provided effective assistance. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). Further, defendant "has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Whether Lord's performance fell below an objective standard of reasonableness is measured by examining if his conduct met prevailing professional norms "necessarily linked to the practice and expectations of the legal community . . . ." *Padilla v Kentucky*, 559 US 356, 366; 130 S Ct 1473; 176 L Ed 2d 284 (2010) (citation omitted). "[D]efendant must overcome a strong presumption that counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012) (citation omitted). "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *Id*. An isolated error by counsel may demonstrate that his or her performance was objectively unreasonable if that error is sufficiently egregious. *Harrington v Richter*, 562 US 86, 111; 131 S Ct 770; 178 L Ed 2d 624 (2011). But "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Id*.

The parties acknowledge that there is recent authority holding that the failure to call an expert witness who is willing to assist the defendant in an SBS/AHT case can amount to deficient performance. In *People v Ackley*, 497 Mich 381, 384; 870 NW2d 858 (2015), the prosecutor intended to rely on several experts who would testify that injuries suffered by a child were most likely the result of intentional physical abuse. The defendant's appointed counsel contacted a single expert for assistance who informed counsel that he would not be able to testify

in support of defendant's case. *Id*. at 385. "He also explained to counsel that there was a marked difference of opinion within the medical community about diagnosing injuries that result from falling short distances, on the one hand, and shaken baby syndrome (SBS) or, as it is sometimes termed, abusive head trauma (AHT), on the other hand." *Id*. "Hunter asserted that this divide is 'like a religion' because each expert has deeply held beliefs about when each diagnosis is supported, and the defendant should have the benefit of an expert who, 'in his or her religion, believes this could be a short-fall death.' " *Id*. (brackets omitted). The expert "emphasized to counsel that he was on the wrong side of this debate to be able to assist the defendant." *Id*.

In *Ackley*, the defendant's counsel "called no expert in support of its theory that the child's injuries resulted from an accidental fall, although the court had provided funding for expert assistance." *Id*. at 384. The defendant's counsel apparently never sought out another expert, despite being given the name of another expert by the expert who declined to testify on the defendant's behalf. *Id*. at 385-386. Nor did counsel read medical treatises or other articles on the topic. *Id*. at 386. Instead, the defendant's counsel continued to seek the same expert's assistance, despite his explanation that he could not support defendant's case. *Id*. at 386-387. Our Supreme Court concluded that the defendant's counsel provided ineffective assistance by completely failing to seek the assistance of an expert who could support the defendant's theory and counter the prosecution's experts, and by failing to develop a trial strategy based on familiarity with the readily available journal articles to educate himself on the medical issues at the core of the case. The defendant's counsel's conduct resulted in the presentation of a defense theory that lacked expert testimonial support and a defense counsel insufficiently equipped to challenge the prosecution's expert. *Id*. at 389-394.

In this case, unlike the defendant's counsel in *Ackley*, the record reflects that Lord investigated SBS/AHT and became informed regarding the conflicting scientific studies. He investigated suitable expert witnesses. Lord was an attorney with over 30 years of experience. His practice was 95% related to criminal matters. His practice included both retained and indigent appointed clients. He tried 15-20 jury trials per year. He was well familiar with the assigned trial judge. He found a suitable expert, Dr. Bandak, who could provide expert testimony to rebut the prosecution's expert witness's testimony. Lord testified at the evidentiary hearing that he paid from his own retainer an initial fee required by Dr. Bandak. To testify at trial, however, Dr. Bandak required an additional fee of $1500 per day plus expenses. Lord testified that he looked for other experts but could find none that were willing to come forward and testify. Lord contacted the State Appellate Defenders Office. Lord did online research. Lord also explained that defendant told him repeatedly that he would pay the required fees for Dr. Bandak to appear and testify at trial. Lord testified that he made clear to defendant the need for expert testimony in his defense and he obtained multiple adjournments of the trial to enable defendant to find funding to pay Dr. Bandak. Defendant made multiple direct and unequivocal representations that he would obtain the funds necessary for retention of an expert. Lord believed defendant's representations that he intended to pay Dr. Bandak's fees by borrowing from his sister or mother. However, two weeks before trial, a trial date which had been adjourned multiple times at the request of Lord, specifically so defendant could obtain the funds he said he would, defendant disclosed to Lord, well after the deadline for filing motions expired that he did not have the money to pay Dr. Bandak's fees and that he chose not to ask his mother for the funds because he did not want her going into debt for him. Lord also testified that

defendant intended to testify on his own behalf and he expressed his belief that he did not need an expert because the jury would find him credible.

Lord also testified at the evidentiary hearing that, with Dr. Bandak's expert assistance, he informed himself of the critical issues to enable him to present a defense theory and cross-examine the prosecution's expert witness regarding the scientific evidence and opinion that conflicted with the prosecution's expert witness's opinions. The trial record reflects that Lord extensively cross-examined Dr. Gilmer-Hill regarding the scientific studies that disagreed with her opinion regarding the cause and origin of the child's injury in this case. Further, in his opening statement and closing argument, Lord presented defendant's defense that the prosecution's expert witness turned a blind eye to scientific studies that contradicted her opinion, and as a result she failed to appropriately analyze the evidence because she relied on a preconceived singular notion of the cause of the child's injury. Lord's opening statement and closing argument reflect a calculated strategy to cast reasonable doubt as to defendant's guilt. Defense counsel's conduct did not deprive defendant of his defense that alternative explanations founded in scientific studies existed to explain the child's injuries that supported defendant's explanation of his innocence. The present case is distinguishable from *Ackley*, where the defendant's counsel did nothing to investigate the availability of a suitable expert and utterly failed to inform himself of the critical issues to enable putting forth a defense. In *Ackley*, the defendant's counsel's ineptitude deprived the defendant of a defense. De novo review of the record establishes that such deficiencies are not present in this case. The record reflects that Lord acted prudently under the circumstances, developed a sound trial strategy, and presented a strong defense for defendant. Accordingly, Lord's conduct did not fall below an objective standard of reasonableness.

Defendant also argues that Lord should have obtained the assistance of another expert who would have provided his or her services to defendant pro bono. "[D]efendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). In his motion for a new trial submitted to the trial court, defendant contended that because he has now found experts willing to provide their services pro bono, surely, Lord could have done the same in 2005. The fact that defendant now may have found pro bono experts to support his cause does not establish that suitable experts were available and willing to serve in this case on a pro bono basis in 2005. Lord testified at the evidentiary hearing that he searched for suitable experts other than Dr. Bandak who could testify on defendant's behalf. He found none willing to come forward and testify. The record reflects that Dr. Bandak's theories were based on cutting-edge technology and were not widely accepted in 2005. Given the state of the debate regarding SBS/AHT diagnoses at that time, we are not persuaded that Lord had the ability in 2005 to find a suitable substitute expert as defendant now contends.

Defendant represents in his brief on appeal that the experts who provided him affidavits in support of his motion for a new trial would have testified for free in 2005. The experts' affidavits, however, say nothing of the sort. The experts' affidavits indicate only that they could have provided helpful testimony to defendant in 2005, but none state that he or she would have testified on defendant's behalf for free. Ultimately, defendant has offered no more than speculation that Lord might have been able to find another suitable expert in 2005 who would have provided testimony supporting defendant's theory of the case for free. Further, defendant

has failed to rebut Lord's testimony at the evidentiary hearing that he sought other experts to assist in this case but could not locate a suitable expert and knew of none who would testify for free. Defendant's argument that Lord provided ineffective assistance in this regard lacks merit because he has not established the requisite factual predicate for his claim of ineffective assistance.[3]

Defendant also asserts that Lord should have sought public funding for Dr. Bandak, or perhaps another expert. Defendant argues that a request for fees should have been made under MCL 775.15. While our Supreme Court has very recently held that this statute does not apply to requests for the appointment of expert witnesses, *People v Kennedy*, 502 Mich 206, 223; 917 NW2d 355 (2018), that is not relevant to our analysis here. At the time of defendant's trial, controlling precedent considered MCL 775.15 as the source for the trial court's authority to provide indigent defendants with funds to hire expert witnesses. See *Kennedy*, 502 Mich at 221-222.

MCL 775.15 states:

If any person accused of any crime or misdemeanor, and about to be tried therefor in any court of record in this state, shall make it appear to the satisfaction of the judge presiding over the court wherein such trial is to be had, by his own oath, or otherwise, that there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot safely proceed to a trial, giving the name and place of residence of such witness, *and that such accused person is poor and has not and cannot obtain the means to procure the attendance of such witness at the place of trial*, the judge *in his discretion may*, at a time when the prosecuting officer of the county is present, make an order that a subpoena be issued from such court for such witness in his favor, and that it be served by the proper officer of the court. And it shall be the duty of such officer to serve such subpoena, and of the witness named therein to attend the trial, and the officer serving such subpoena shall be paid therefor, and the witness therein named shall be paid for attending such trial, in the same manner as if such witness had been subpoenaed in behalf of the people. [Emphasis added.]

Before *Kennedy*, courts interpreted MCL 775.15 to authorize discretionary "payment for an expert witness, provided that an indigent defendant is able to show that there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot safely proceed to trial[.]" *People v Carnicom*, 272 Mich App 614, 617; 727 NW2d 399 (2006) (quotation marks and citation omitted). If the defendant made the required showing, the trial court had the discretion to "grant funds for the retention of an expert witness." *Id*. "A trial court [was] not compelled to provide funds for the appointment of an expert on demand." *Id*. (citation omitted).

---

[3] The *Ginther* hearing transcript discloses the strategic analysis undertaken by Lord, based on his three decades of trial experience, respecting the advantages of experts who are exceptionally well qualified and the disadvantages of lesser qualified experts who can actually harm a client's case.

To qualify for funds to pay an expert, defendant would have been required to demonstrate that he was, in fact, indigent at the time he sought funds. Defendant claims on appeal that the trial court concluded that he was indigent in 2005, and that such a finding is unquestionably correct. Defendant, however, misrepresents the trial court's decision. The trial court did not make a finding that defendant was indigent. The trial court simply noted that Lord did not testify that defendant had more financial resources available than defendant had represented to him. Further, Lord relied on defendant's representation that he lacked sufficient cash on hand to pay Dr. Bandak at the time of his trial. That does not conclusively establish indigence, and is not a finding of indigence by the trial court.

The question whether defendant could establish indigent status in 2005 cannot be easily ascertained. No hard-and-fast rule exists for defining indigence. *People v Arquette*, 202 Mich App 227, 230; 507 NW2d 824 (1993). The applicable court rule, MCR 6.005(B), remains the same now as it was in 2005, and established the factors for consideration by the trial court to determine whether a criminal defendant is indigent:

> (1) present employment, earning capacity and living expenses;
>
> (2) outstanding debts and liabilities, secured and unsecured;
>
> (3) whether the defendant has qualified for and is receiving any form of public assistance;
>
> (4) availability and convertibility, without undue financial hardship to the defendant and the defendant's dependents, of any personal or real property owned; and
>
> (5) any other circumstances that would impair the ability to pay a lawyer's fee as would ordinarily be required to retain competent counsel.
>
> The ability to post bond for pretrial release does not make the defendant ineligible for appointment of a lawyer.

Defendant correctly asserts that an indigent defendant's status does not change simply because his friends or family decide to pay for his legal defense. In *Arquette*, 202 Mich App at 230, this Court explained that "indigence is to be determined by consideration of the defendant's financial ability, not that of his friends and relatives." In this case, whether defendant would have been found indigent is questionable. The record reflects that defendant had regular employment for years, rented a home, and paid utilities. No evidence establishes that he received any form of public assistance. The record reflects that his annual wages in 2005 were at least $15,000. He also received $50 a week in child support. Thus, he had an annual income of over $17,000. While certainly not dispositive, in 2005, the federal poverty level for an individual with one dependent child was $12,380.[4] Defendant's income was nearly 140% of the

---

[4] See Prior HHS Poverty Guidelines, available at https://aspe.hhs.gov/prior-hhs-poverty-guidelines-and-federal-register-references. This Court may take judicial notice of facts that are

federal poverty level in 2005. Defendant has not established that he would have been determined indigent at the time of his trial.

Regardless, the question remains whether Lord's failure to seek funds from the trial court constituted objectively unreasonable conduct. Lord's testimony at the evidentiary hearing establishes that he knew that in the defense of an indigent defendant during 2005, he could turn to the court for funds to hire an expert witness, having done so on other occasions. Lord, however, testified that he had never himself sought such funding for a defendant who had retained him and he also lacked awareness of any other retained attorney who ever sought funding from the court for an expert witness. We cannot fault Lord for failing to advance what would have been a fairly novel position, that an individual in defendant's financial position, and who had twice retained counsel in this case, could nonetheless qualify as an indigent defendant entitled to court funding of an expert witness. See *People v Reed*, 453 Mich 685, 695; 556 NW2d 858 (1996) (counsel cannot be deemed ineffective for failing to advance a novel legal argument).[5]

Even if we assume that the trial court would have deemed defendant indigent, the record reflects that Lord made strategic trial decisions in consultation with his client and consulted with Dr. Bandak to present the defense favorable to defendant. The record indicates that Lord followed his client's direction after fully advising him, prepared his defense, and advocated diligently for defendant at trial. Defendant cannot fault Lord for believing his representations throughout the preparation of his case right up to two weeks before trial that he would pay Dr. Bandak's fees. The record also reflects that, even if Lord requested funds from the trial court, the $500 customary amount granted by local courts in 2005 would have fallen short of the amount needed for Dr. Bandak's trial preparation and testimony. Therefore, even a successful motion for expert funds likely would have provided defendant no guaranty of the ability to pay for Dr. Bandak's trial testimony. Accordingly, even if we were to find that Lord's conduct fell below an objective standard of reasonableness, we are not convinced that, but for such purported deficient conduct, the outcome would have been different. *Trakhtenberg*, 493 Mich. at 51.

The record establishes that, faced with defendant's late announcement that he could not obtain the funds to pay Dr. Bandak, Lord adjusted the defense strategy and relied on defendant's testimony, as well as, the information he learned from Dr. Bandak, to successfully cross-examine the prosecution's expert. Defendant approved this trial strategy. While Lord was not necessarily bound by defendant's belief that he could prevail without an expert, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland v Washington*, 466 US 668, 691; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

---

"capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." MRE 201(b).

[5] The record from the evidentiary hearing establishes that in 2005, it is highly unlikely that the trial court would have provided public funds for the retention of an expert in a case where defendant was represented by privately retained counsel.

Defendant asks over a decade later that, with the benefit of hindsight and disregard for his own actions in determining his defense, we conclude that Lord provided him ineffective assistance. However, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 US at 689. As the United States Supreme Court explained in *Harrington*, 562 US at 105:

> Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom. [Quotation marks and citations omitted.]

De novo review of the record in this case does not support defendant's claims of ineffective assistance of counsel. Therefore, defendant has failed to establish that Lord's performance fell below an objective standard of reasonableness under the prevailing norms of competent practice at the time, and defendant cannot establish that but for Lord's conduct, defendant's trial would have resulted differently. Accordingly, defendant lacks entitlement to any relief.

Affirmed.

/s/ James Robert Redford
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly

-11-